UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/16
```

DANIEL PENADES,

         Plaintiff,

-v-

THE REPUBLIC OF ECUADOR,

         Defendant.

No. 15-cv-725 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, District Judge:

  Plaintiff, proceeding *pro se*, brings this action against Defendant, the Republic of Ecuador, asserting claims arising out of Defendant's alleged default on an indenture for bonds held by Plaintiff and discrimination against Plaintiff's bonds in favor of other debt issued by Defendant. Now before the Court is Defendant's motion to dismiss. (Doc. No. 45.) For the reasons set forth below, Defendant's motion is granted.

I. BACKGROUND[1]

  Plaintiff is the owner of certain thirty-year bonds issued by Defendant (the "2030 Bonds" or the "Bonds"). (Compl. ¶¶ 2–3.) The 2030 Bonds were issued pursuant to an indenture agreement, dated August 23, 2000, under which U.S. Bank National Association would serve as trustee (the "Trustee") and Citibank, N.A. would serve as paying agent, transfer agent, and registrar (the "Agent."). (*See* Doc. No. 2-1 at 29.) Under the Indenture, Defendant agreed to make interest

---

[1] The following facts are taken from the complaint and its attachments, including the indenture. (*See* Doc. Nos. 2 ("Compl.") and 2-1 Ex. 9, 2-2 (collectively the "Indenture")). *See Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011) (noting that a court may consider documents attached to the complaint on a motion to dismiss). The Court also considers the arguments raised in Defendant's memorandum of law (Doc. No. 46 ("Mem.")), Plaintiff's opposition (Doc. No. 53 ("Opp'n")), and Defendant's reply (Doc. No. 54 ("Reply")).

payments on the Bonds twice a year, on August 15 and February 15 (the "Interest Payment Dates"), until August 15, 2030, on which date Defendant would pay the "aggregate outstanding principal amount." (Indenture Ex. A at A-1, Ex. B. ¶¶ 3–4, 16.) Defendant would initially owe a rate of 4% interest per annum from August 23, 2000 until August 15, 2001. (Indenture Ex. B ¶ 4.) The interest rate would grow by 100 basis points each year for six more years, and Defendant would then owe 10% interest on each Interest Payment Date from "August 15, 2006 to maturity." (*Id.*) To ensure timely payments to bondholders, the Agreement also provided that Defendant would make disbursements to the Agent "at least one Business Day prior to each interest payment date or the maturity date . . . of the Bonds," and that the Agent would hold such payments in trust for the bondholder's benefit. (Indenture § 3.4.) The Indenture also included a "*pari passu*" provision, pursuant to which Defendant agreed not to subordinate the 2030 Bonds to other, similar obligations. (Indenture Ex. B ¶¶ 1(c), 6(b).)

In addition, the Indenture included a so-called "no-action clause," pursuant to which an individual bondholder may only bring suit under the Indenture or the 2030 Bonds if the bondholder satisfies the conditions precedent detailed in Section 4.5 of the Indenture or qualifies for the exception set forth in Section 4.6. (Indenture §§ 4.5, 4.6.) Specifically, Section 4.5 permits individual bondholders to sue "upon or under or with respect to this Indenture or the Bonds" if: (1) the bondholder has previously given the Trustee or Agent notice of Defendant's default; (2) the bondholders of "not less than 25 percent in aggregate principal amount of the Bonds then Outstanding" have delivered a written request to the Trustee or Agent to bring suit in the Trustee's or Agent's own name and have offered to indemnify the Trustee or Agent for its costs and liabilities in connection with the suit; and (3) the Trustee or Agent has failed to bring suit within 60 days of receipt of such notice. (*Id.* § 4.5.) Notwithstanding these requirements, Section 4.6 of the

Indenture also grants bondholders an "unconditional right" to sue for Defendant's failure to pay principal and interest "on the stated maturity expressed in [the] Bonds." (*Id.* § 4.6.) The full text of Section 4.6 is as follows:

> *SECTION 4.6. Unconditional Right of Bondholders to Receive Principal and Interest at Maturity*
>
> Notwithstanding any other provision in this Indenture, each Bondholder shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on . . . its Bonds on the stated maturity expressed in such Bonds and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Bondholder.

(*Id.*)

On January 30, 2015, Plaintiff, proceeding *pro se* and *in forma pauperis*, commenced this action alleging breach of contract. (Doc. Nos. 2, 4.) Specifically, Plaintiff alleges that Defendant has (1) refused to pay any interest owed to him on the 2030 Bonds on any Interest Payment Date since February 15, 2009 and (2) subordinated the 2030 Bonds by issuing new bonds on more favorable terms, in violation of the Indenture's *pari passu* provisions. (Compl. ¶¶ 5, 41, 46, 69.) On January 15, 2016, Defendant filed the instant motion to dismiss (Doc. No. 45), which was fully briefed on February 26, 2016 (Doc. No. 54).

II. SUBJECT MATTER JURISDICTION

Defendant curiously seeks dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) on "standing" grounds. (Mem. 5.) Although, Rule 12(b)(1) may be an appropriate vehicle for challenges to a party's standing to sue under Article III of the United States Constitution, *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87–88 & n.6 (2d Cir. 2006), Defendant challenges the sufficiency of Plaintiff's compliance with the Indenture's no-action clause, which is a contractual issue totally unrelated to Article III standing. Not surprisingly, Defendant makes no other arguments regarding this Court's subject matter jurisdiction, since the

Court has jurisdiction "over any civil claims against a foreign state for which there is no immunity under" the Foreign Sovereign Immunities Act ("FSIA"), *Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 379 (S.D.N.Y. 2000), and Defendant has waived sovereign immunity with respect to this action (*see* Indenture § 9.8); *see also Kim v. Korea Trade Promotion-Inv. Agency*, 51 F. Supp. 3d 279, 283–84 (S.D.N.Y. 2014) (discussing the requirements for waiver under the FSIA). Accordingly, Rule 12(b)(6), not Rule 12(b)(1), is the proper vehicle for Defendant's motion.

III. FAILURE TO STATE A CLAIM

A. Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from

Case 1:15-cv-00725-RJS Document 57 Filed 09/30/16 Page 5 of 10

conceivable to plausible, [his] complaint must be dismissed." *Id*. at 570. "Where, as here, the complaint was filed *pro se*, it must be construed liberally to raise the strongest arguments it suggests. Nonetheless, [even] a *pro se* complaint must state a plausible claim for relief." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014).

### B. Discussion

It is "well established" that "interpretation of indenture provisions is a matter of basic contract law." *Bank of N.Y. Trust Co. v. Franklin Advs., Inc.*, 726 F.3d 269, 276 (2d Cir. 2013). Here, New York contract law governs, since the Indenture includes an unambiguous choice-of-law provision (*see* Indenture ¶ 9.8(a)) and neither party disputes application of New York law, *see Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006). The first step in assessing a contract claim governed by New York law is to determine "'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Deben. Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015). Thus, the court "resolve[s] any contractual ambiguities in favor of the plaintiff" on a motion to dismiss, *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005), and "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim," *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012). On the other hand, a court "may dismiss a breach of contract claim on a Rule 12(b)(6) motion" if the "contract's language is clear and unambiguous." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013); *accord Bayerische Landesbank*, 692 F.3d at 56.

This motion turns entirely on the interpretation and application of Sections 4.5 and 4.6, the Indenture's provisions that govern a bondholder's right to sue. Section 4.5 is a "no action clause," which "require[s] individual bondholders to satisfy conditions precedent before initiating suit." *MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 513 (S.D.N.Y. 2015). Although such clauses are "strictly construed," they are, nonetheless, "regularly enforced by federal and state courts to preclude state law claims" that are brought under an indenture. *Id.*; *see also Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 566 (2014) (noting that no-action clauses are designed to "protect against the risk of strike suits" and to "make[] it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders" (brackets omitted)). The scope of Section 4.5 is extremely broad, applying to "any suit, action or proceeding" brought "upon or under or with respect to the Indenture or the Bonds." (Indenture § 4.5.) Among other things, Section 4.5 requires, as conditions precedent to bringing suit, that the bondholder provide notice to the Trustee or Agent of any default, that the owners of "not less than 25 percent in aggregate principal amount of the Bonds then Outstanding" deliver a written request to the Trustee or Agent to sue, and that such bondholders offer to indemnify the Trustee or Agent for its costs and liabilities in connection with the suit. (*Id.*)

The Court concludes that both of Plaintiff's causes of action – his claim for recovery of unpaid interest and his claim for specific enforcement of the *pari passu* provision – unambiguously qualify as suits brought "upon or under or with respect to this Indenture or the Bonds," and therefore fall within the ambit of Section 4.5. *See Vertin*, 23 N.Y.3d at 564 ("[A] no-action clause . . . that refers specifically to claims and remedies arising under the indenture and the securities, applies to all claims, except those excluded from coverage as a matter of law."). While Plaintiff alleges that he provided notice to the Trustee of Defendant's failure to make interest

payments (*see* Compl. ¶¶ 67–68), he does not allege that he satisfied any of the other conditions precedent set forth in Section 4.5. In fact, Plaintiff all but admits that he has failed to comply with Section 4.5 in his opposition brief, since he makes no arguments with respect to that section and focuses his brief entirely on Section 4.6. (*See* Opp'n 7–8.) Accordingly, Plaintiff's suit must be dismissed because of his failure to comply with Section 4.5 unless either of his claims qualifies for the exception set forth in Section 4.6.

Section 4.6, by its very title, grants bondholders an "unconditional right . . . to receive principal and interest at maturity." (Indenture § 4.6.) Thus, notwithstanding the conditions precedent set forth in Section 4.5, Section 4.6 authorizes bondholders to sue to enforce the right "to receive payment of the principal of and interest on" the Bonds "on the stated maturity expressed in such Bonds." (Indenture § 4.6.) In other words, Section 4.6 authorizes suit for unpaid principal and interest – not for violations of the *pari passu* provisions – and only on the date of the Bonds' "maturity." Although the terms "maturity" and "stated maturity" are not defined under the Indenture, "maturity" commonly denotes the "termination of the period that a note or other obligation has to run." *Webster's Third New International Dictionary, Unabridged* 1395 (2002); *accord Black's Law Dictionary* 478 (10th ed. 2014) (defining "date at maturity" as the "[t]he date when a debt falls due, such as a debt on a promissory note or bond"); *see also Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (noting that "it is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract" (brackets omitted)). The phrase "stated maturity" has an even more specific meaning, and, consistent with Defendant's interpretation of Section 4.6, is defined as "[t]he last date on which a debt obligation can be still outstanding." Peter Moles & Nicholas Terry, *Handbook of International Financial Terms* 516 (1997);

More significantly, these ordinary meanings of the terms "maturity" and "stated maturity" are consistent with other sections of the Indenture, in which the parties also contemplate the "maturity" date being the date when Defendant is obligated to pay the principal. (Indenture § 2.4(f) ("following a failure *to pay principal* in respect of any Bond *at maturity*" (emphasis added)); *id.* § 4.1 (the "principal" of the Bonds "shall become due and payable . . . *upon maturity*," unless "by declaration or otherwise" (emphasis added)). Accordingly, the Court concludes that Section 4.6 authorizes an unconditional right to sue on the date of the bond's maturity – which is not until 2030.

Plaintiff nevertheless argues that each failure by Defendant to pay interest due on the Interest Payment Dates constituted an event of "maturity" under the Indenture, thereby triggering his right to sue under Section 4.6. (Opp'n 7–8.) Yet Plaintiff's interpretation, in addition to contravening the ordinary meaning of the term "maturity," also squarely contradicts his own allegations in his complaint. Specifically, Plaintiff alleges that the 2030 Bonds "mature on August 15, 2030," and therefore, "are not mature" now. (Compl. ¶¶ 41, 69.)

In any event, the Court finds Plaintiff's argument to be unpersuasive, since the Indenture repeatedly characterizes the "maturity" of the 2030 Bonds and the Interest Payment Dates as separate events. Section 3.4 of the Indenture provides that Defendant shall pay the Agent "at least one Business Day prior to *each interest payment date or the maturity date* (each, a 'Payment Date') of the Bonds." (Indenture § 3.4(a) (emphasis added).) Plaintiff's reading of the Indenture, whereby each Interest Payment Date would also be a separate "maturity date," would render the term "Interest Payment Date" surplusage in Section 3.4. *See Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) ("The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract."). Moreover, if the parties

8

had truly intended to grant bondholders an unconditional right to sue for missed interest payments at any time, as Plaintiff claims, they presumably would have used the more comprehensive and defined term "Payment Date" – which includes both the Interest Payment Dates and the maturity date (Indenture § 3.4(a)) – rather than the term "the stated maturity" in Section 4.6. Furthermore, paragraph 4 of Exhibit B requires that Defendant pay a rate of 4% interest per annum from August 23, 2000 until August 15, 2001; that such interest rate grow by 100 basis points each year until 2006; and that Defendant pay 10% interest from "August 15, 2006 to *maturity*." (Indenture Ex. B ¶ 4 (emphasis added).) In other words, the schedule of interest rate payments contemplate "maturity" taking place on a single date, upon which all remaining payments on the bond are due. Similarly, paragraph 8(a) of Exhibit B requires the bondholders' unanimous consent for a change to "the stated *maturity of the principal of or interest on* any such bond." (Indenture, Ex. B ¶ 8(a).) Thus, paragraph 8(a) differentiates "the stated maturity of the principal of . . . any such bond," on the one hand, and the "interest on any such bond," on the other. These various provisions lead to only one plausible conclusion: that the term "maturity" in Section 4.6 refers to the termination of the period that the bond has to run, not to each individual Interest Payment Date. *See Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 362 (S.D.N.Y. 2014) ("[A] word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons . . . ."), *aff'd*, 628 F. App'x 802 (2d Cir. 2015).

Accordingly, the Court finds that Section 4.6 unambiguously authorizes suit only if and when Defendant fails to timely fulfill its obligations on the maturity date, which is not until August 15, 2030. Thus, because Section 4.6 does not provide a basis for Plaintiff to sue before the maturity of the Bonds in 2030, and because Plaintiff has failed to comply with the conditions precedent set

forth in Section 4.5, the Court concludes that Plaintiff fails to state a claim upon which relief can be granted.

V. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendant's motion to dismiss is granted. The clerk is respectfully directed to terminate the motion pending at docket number 45, to mail a copy of this opinion and order to Plaintiff, and to close this case.

SO ORDERED.

Dated:       September 30, 2016
             New York, New York

                                                    _____
                                                    RICHARD J. SULLIVAN
                                                    UNITED STATES DISTRICT JUDGE